# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**GLENN J. DORSEY**                                    **CIVIL ACTION NO.: 11-231**

**VERSUS**                                             **JUDGE: JOHN J. BRADY**

**U.S. BANK NATIONAL ASSOCIATION**          **MAG. JUDGE CHRISTINE NOLAND**
**AND PAYPAL, INC.**

## <u>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO</u>
## <u>12(B)(6) MOTION OF PAYPAL</u>

**MAY IT PLEASE THE COURT:**

An identity thief stole Mr. Dorsey's bank account information, used Mr. Dorsey's personal information to open a PayPal account, and then, through a series of transactions spread out over a fourteen month time period between August 2009 and October 2010, transferred approximately $1.9 million dollars from Mr. Dorsey's bank account into the fraudulent PayPal account and thence to destinations unknown.

Mr. Dorsey has sued PayPal and the bank. Mr. Dorsey contends that PayPal is liable to him for violations of EFTA, and/or under theories of negligence, conversion, and unjust enrichment. PayPal has filed a 12(b)(6) motion to dismiss (Rec. Doc. No. 24) and supporting memorandum (Rec. Doc. No. 24-1). For the following reasons, PayPal's motion should be denied:

## I.    INFORMATION WHICH IS NOT KNOWN AT THIS TIME

PayPal and the bank have evidently investigated the thefts, but have not yet shared the results of the investigation with plaintiff or this Court. As a result, the following information is unknown: the identity of the thief; the exact mechanism by which the thefts took place; whether a bank employee intentionally participated and/or unwittingly acted (or failed to act) in a manner which facilitated the thefts; whether a PayPal employee intentionally participated and/or unwittingly acted (or failed to act) in a manner which facilitated the thefts; whether there is any factual basis to support

the conclusion that either the bank or PayPal liable for negligent hiring or supervision.  In addition, little is known about what PayPal actually does and it is not clear how PayPal's business should be classified for the purpose of determining what legal duties, if any, PayPal may have to a person in Mr. Dorsey's situation.

## II.  PAYPAL'S HISTORY AND OPERATIONS:  *WHAT, EXACTLY, DOES PAYPAL DO?*

In an effort to determine what legal principles govern PayPal's operation, and what duties, if any, PayPal may have to a person in Mr. Dorsey's situation, plaintiff has reviewed articles in business journals, opinions of regulators, and similar materials.  Plaintiff now discusses this information to provide a context to evaluate PayPal's legal arguments.

PayPal is a corporation which operates an online payment service that allows businesses and individuals to send and receive payments over the internet.  PayPal was founded in 1998 and, over a period of slightly more than ten years, has grown from a small company to a major worldwide financial organization which, as of 2009, processed $ 71 billion in payments for 232 account holders, earning revenues of approximately $643 million (*Wikipedia: PayPal,* http://en.wikipedia.org/wiki/PayPal).

PayPal has grown so rapidly and its operations have evolved so drastically that it is difficult to offer a comprehensive description of PayPal's activities.  However, it appears that PayPal enters into an account agreement with customers which allows the account holder to transfer money from an ordinary bank account into a "PayPal account" and, from the "PayPal account," to merchants, banks, or other financial institutions nearly anywhere in the world.[1]  The account agreement gives

---

[1] The current version of the PayPal account agreement may be downloaded from PayPal's website, is twenty six pages long, and contains highly detailed provisions governing PayPal's interactions with its account holders, as well as an elaborate fee schedule which establishes the fees which PayPal may deduct from the deposited funds as compensation for processing a wide variety of transactions.  (*PayPal website*: https://cms.paypal.com/us/cgi-bin/marketingweb?cmd=_render-content&content_ID=ua/UserAgreement_full&locale.x=en_US).  PayPal fees are

PayPal a considerable degree of control over funds deposited in such accounts, including, for example, the right to "freeze" the funds for up to 180 days in the event of a dispute or in the event that PayPal receives information suggestive of fraud.

What actually happens when a customer "transfers funds to a PayPal account" is that PayPal withdraws the money from the customer's personal bank account and deposits the money in a different bank account or money market fund which is held in the name of PayPal. In an opinion dated June 3, 2002, the State of New York Banking Department summarized PayPal's then-operations as follows (Exhibit A – letter dated June 3, 2002 from Alvin A. Narin, Assistant Counsel for State of New York Banking Department to John D. Muller, General Counsel and Secretary for PayPal, Inc.): [2]

> According to PayPal, its business model now offers a customer five (5) options with respect to the payment and receipt of monies through PayPal's service. Additionally, funds are distributed in accordance with the PayPal User Agreement that creates a contractual relationship between PayPal and its customers.
>
> Under the first method of disbursement, funds are placed into an account at a bank that the PayPal customer can access by either a physical or virtual debit card. The second option is a wire transfer by Wells Fargo Bank, on behalf of PayPal, to the bank account at a third party bank in the name of the PayPal customer. The third option is that a check payable to the PayPal customer . . . is processed by Wells Fargo Bank and forwarded to that customer. . .
>
> When a PayPal customer does not direct PayPal to immediately disburse said funds, PayPal provides two options: (a) sweeping funds to purchase shares in the customer's name in the PayPal Money Market Fund ("Money Market Account"); or (b) pooling funds with other customer funds and placing them in a bank account denominated, "PayPal, Inc. as agent for the benefit of its customers" at one or more FDIC-insured banks ("FBO Account").

---

usually a percentage of the amount of money transferred. In our case, the amount of money transferred out of Mr. Dorsey's account was in excess of $1.9 million and, as far as plaintiff can estimate by examining PayPal's posted fee schedule, the dollar amount of the fees collected by PayPal for transferring Mr. Dorsey's money was in the range of $5,000 to $40,000. These fees were deducted by PayPal from the money transferred from Mr. Dorsey's account at the time of the transfer.

[2] During the time period from 2000 to 2002, the New York state banking department investigated PayPal to determine whether PayPal was engaged in banking activity in violation of New York state banking law. PayPal modified its business operations to meet the objections of New York regulators and, in an opinion dated June 3, 2002, assistant counsel for the New York banking department advised that PayPal's operations, as modified, were deemed not to constitute banking activity and, therefore, were outside the scope of New York State banking law.

According to PayPal, the Money Market sponsor is an independent entity not affiliated with PayPal. The Money Market is subject to regulation by the Securities and Exchange Commission ("SEC"). . .

PayPal's user agreement states that PayPal is only the customer's agent with respect to funds in the FBO Account. . .

In a November 7, 2005 letter to the executive secretary of the FDIC, PayPal's then Vice President and General Counsel, Mr. John D. Muller, describes PayPal's activities as follows (Exhibit B – letter dated November 7, 2005 from John D. Muller, Vice President and General Counsel for PayPal, Inc. to Robert E. Feldman, Executive Secretary for the Federal Deposit Insurance Corporation):

PayPal acts much like the issuer of a stored value card. PayPal pools those customers' funds and places those funds in well-capitalized banks as agent for its customers.

PayPal's 12(b)(6) motion characterizes PayPal's role in the various financial transactions made through the PayPal website as entirely passive (defense memorandum pages 6-7):

PayPal never had possession of plaintiff's funds . . . the PayPal account holder, not PayPal, controls and effects the transfer of any funds via PayPal.

However, a review of the background information set forth above show that this characterization is debatable or flatly inaccurate. PayPal actively transfers, deposits, holds, and re-transfers funds; during the course of these activities, PayPal exercises considerable control over the funds by, for example, accepting the funds in the capacity of agent for the PayPal account holder; selecting the money market sponsors and depository banks which are to hold the funds; depositing the funds in accounts in these money markets and banks—accounts held in the name of PayPal, which only PayPal employees can access; disbursing the funds from these accounts (which includes disbursing certain funds to itself in payment of the fees to PayPal under PayPal's contracts with its account holders); and asserting its contractual right to "freeze" funds in the event of a dispute or suggestion of fraud.

**PayPal and Fraud**

A review of PayPal's website will reveal that PayPal makes it extremely easy for a new customer to open a new PayPal account. An account can be set up over the internet, and all that is necessary is an email address, a password, and information from the customer's bank statement. The customer types the bank account information into PayPal's website and this links the bank account to the new PayPal account. Once this is done, the customer can conveniently transfer money from the customer's bank account to the customer's PayPal account and from the customer's PayPal account to wherever the customer chooses.

As a corollary, it is also extremely easy for an identity thief to open a new PayPal account. All the thief has to do is steal a copy of the victim's bank statement from the victim's mailbox or trash can. Armed with this statement, the thief can go to any terminal and use the identifying information from the victim's bank statement to set up a PayPal account. Once this is done, the thief can transfer money from the victim's bank account to the thief's PayPal account and from the thief's PayPal account to wherever the thief chooses.[3]

As far as plaintiff can determine, this simple process is the method by which the identity thief looted Mr. Dorsey's bank account. However, as noted above, plaintiff has not received the investigation results from defendants and cannot exclude the possibility that a bank or PayPal employee may have been responsible for the thefts.

PayPal's own website asserts that PayPal has strict internal fraud controls, but the details of these programs are not supplied.[4] These controls, obviously, were ineffective in our case.

---

[3] It should be noted that, because all transactions take place online, a PayPal account can be set up from any internet terminal and money transfers can be initiated from any internet terminal. Thus, a customer (or thief) who is physically located in Idaho can set up a PayPal account which will permit the customer (or thief) to make withdrawals from a Florida bank account and deposit this money into a bank in New York—or New Zealand—or any of several dozen other foreign countries.

[4] As far as your plaintiff can determine, PayPal's fraud control program consists of using sophisticated computer programs which are designed to identify "suspicious" patterns of activity in PayPal accounts. PayPal apparently does not

As a practical matter, could PayPal have done anything that would have offered greater protection to Mr. Dorsey?  Plaintiff suggests that there are several things PayPal could have done. For example, banks routinely take multiple steps to confirm the identity of any person who opens a new account.[5]  If PayPal had taken similar steps to confirm the identity of the "new customer" who used Mr. Dorsey's identifying information to open a PayPal account, it appears probable that the thief would have been caught.

PayPal's position, however, is that PayPal is not required to take the same precautions as a bank because PayPal is not a bank.  If PayPal is not a bank, then what, exactly, is PayPal's legal status?

### III.     PAYPAL'S LEGAL STATUS:  Bank, Licensed Money Transmitter, Both of the Above, or Something Completely Different?

In early battles with federal and state regulators, PayPal was able to convince regulators that it should not be regarded as a bank because it did not accept deposits and merely held funds as agent for its customers.   It is reported that, in an advisory letter dated March 13, 2002, FDIC representatives offered the opinion that PayPal, as of that date, was not a "bank" for the purposes of federal law because PayPal did not accept deposits; therefore PayPal was not subject to regulation by the FDIC and it was up to state authorities to regulate PayPal under whatever state law might be applicable.[6]  The June 2002 opinion of the State of New York Banking Department quoted above was written to address the issue of whether PayPal had violated state banking laws.  The New York

---

make any attempt to confirm the identity of persons opening new accounts and it is not clear what PayPal does to monitor existing accounts.

[5] In fact, since the date of the 9-11 terrorist bombings, banks have been required by law to confirm the identity of all persons opening new accounts *See, e.g.,* 31 CFR 103.11 (2009); 31 CFR 103.121 (2009) (the regulations which were in effect in August 2009 and which required banks to take various steps to confirm the identity of all new customers); 31 CFR 1020.220 (2011) (the regulation in effect today which requires banks to take various steps to confirm the identity of all new customers.)  On information and belief, most banks take steps to confirm customer identity which are more extensive than the minimum steps required by law.

[6] Plaintiff has not yet located a copy of the advisory letter and, therefore, must rely on summaries published in the contemporary business journals.  *See, e.g.,* CNET News:  http://news.cnet.com/2100-1017-858264.html.

regulators, like the FDIC, accepted PayPal's argument that PayPal was holding customer funds in the capacity of agent for its customers rather than as depository, therefore PayPal was not a bank and did not have to comply with state banking laws. However, in the view of New York regulators, this did not mean that PayPal was not subject to regulation under New York state law. The New York authorities concluded by recommending that PayPal should voluntarily place itself under the jurisdiction of the appropriate state regulatory authority by seeking a New York money transmitter license.

PayPal was apparently content to adopt the recommendation of the New York regulators, since PayPal's 2005 letter to the FDIC characterizes PayPal as "an online payments company that operates as a licensed money transmitter." This history would suggest that, in our case, PayPal's liability should be analyzed under the laws governing licensed money transmitters.[7]

However, further examination will show that the issue of PayPal's current status cannot be so easily resolved. To begin with, Louisiana recognizes and regulates licensed money transmitters. However, as set forth in plaintiff's opposition to US Bank's contemporaneous motion which is incorporated herein by reference, this case involves choice of law issues,[8] and it appears that Missouri law may apply. A cursory survey of Missouri law will indicate that Missouri does NOT recognize or regulate licensed money transmitters. Thus, it appears that, for the purposes of this litigation, it may be appropriate to analyze PayPal's activities and potential liability the Missouri state banking laws. In other words, PayPal could be a "licensed money transmitter" in Louisiana and a "state bank" in Missouri.

---

[7] In fact, a review of business journal reports will indicate that, in the wake of the FDIC's March 2002 advisory opinion, the State of Louisiana actually sought to regulate PayPal under the Louisiana laws governing licensed money transmitters, LSA-6:1031 et seq. *See, e.g.*, CNET News: http://news.cnet.com/2100-1017-858264.html.
[8] Since the unauthorized transfers occurred after Mr. Dorsey had permanently relocated to Missouri, it appears that Missouri law rather than Louisiana law may be applicable.

To further complicate matters, PayPal's activities and business model have evolved considerably since the 2002 and 2005 documents referenced above. Some part of this evolution was reported in a June 2007 Bloomberg Business Week article titled *The Bank of PayPal*.[9] According to this article, PayPal has increasingly taken on functions which are traditionally the functions of banks, culminating in PayPal's decision to obtain a European banking license which will result in PayPal becoming an actual bank in Europe:

> To compete with banks, PayPal is becoming more like a bank itself. For the past year, PayPal has tested a virtual debit card enabling users to make purchases with PayPal on Web sites that do not offer it as a payment option. The service, which PayPal plans to launch broadly before the holiday shopping season, provides a one-time MasterCard number for a given purchase. The money is then debited from the user's PayPal account.
>
> Also like a bank, PayPal has long doled out interest on balances left in PayPal accounts. The rate, often more than 4%, is typically higher than that offered by brick-and-mortar banks. It also offers actual plastic credit cards, through a partnership with GE Consumer Finance . . .
>
> Last month, PayPal received a banking license with the Luxembourg bank authority. Starting July 2, all European accounts will be transferred to the PayPal Luxembourg bank. (PayPal is not regulated as a bank in the U.S., in part because its services are offered in conjunction with regulated entities such as GE and MasterCard.)

As the concluding sentence of the above quote shows, the article's author, writing in 2007, assumed that PayPal would continue to NOT be a bank in the eyes of U.S. regulators. However, PayPal's evolution has continued since 2007. PayPal has recently provided a method by which a customer uses a camera phone to deposit a check directly into his/her PayPal account by taking a photo of the check. This eliminates the necessity of going to a bank in order to deposit funds:[10]

> PayPal has now updated its application for Android phones with some new interesting and convenient new features. The latest version (2.8.0) lets users take a picture of a check, send it to PayPal, and have the amount added to their PayPal account. Some other features include, search for nearby businesses that accept PayPal for purchases, and the ability to run from the SD card. . .

---

[9]Bloomberg Business Week, 6-15-07, Holahan, Catherine, "*The Bank of PayPal.*" http://www.businessweek.com/technology/content/jun2007/tc20070614_606853.htm.
[10] http://www.android4lyfe.com/2011/05/18/paypal-app-updated-to-accept-check-deposits-via-camera.

Send money to your friends, manage your account, and more, with the PayPal app. It's free, secure and more convenient than going to the bank, writing checks, or sending gifts the old way.

In sum, the bank's traditional role in accepting a check for deposit has been completely taken over by PayPal. This brings us full circle, because the reason the FDIC decided, in March 2002, that PayPal was not a bank was that, in March 2002, PayPal did not accept deposits.

All this presents a question: has PayPal, by taking on more and more bank functions, changed its business model to the point that the FDIC's 2002 opinion should be revisited? Based on the information available to plaintiff, it would seem that this is a serious question with public policy implications as well as implications for the immediate case.[11]

For the purposes of PayPal's 12(b)(6) motion, it is necessary to know which body of law provides the legal principles governing plaintiff's claim. Is PayPal a "licensed money transmitter," an "agent for its account holder," a state bank for the purposes of Missouri law, a federal bank for the purposes of federal banking law, all of the above, or some other entity of a completely different kind?

And to know which body of law applies, it is necessary to have accurate up-to-date information concerning PayPal's current business operations. This is a determination which cannot be made on the face of the pleadings, a point which strongly militates against granting PayPal's 12(b)(6) motion. This is, because the applicable body of law cannot be identified at the pleading

---

[11] PayPal may wish to argue that, when it accepts a check for deposit using the new camera phone method, PayPal is still not acting as a bank and is, instead, continuing to do what it has always done: acting as intermediary and placing the funds on deposit in a bank account established at a real bank. However, this does not necessarily solve the problem of PayPal's status. As far as plaintiff can determine, PayPal has taken over all traditional banking functions including all interactions with customers. Funds of PayPal's customers are deposited in a bank selected by PayPal in an account held in PayPal's name and solely controlled by PayPal. The customers have no direct interaction with the depository bank and probably do not even know the identity of the depository bank. In this case, can it still be said that the customer is depositing money "in the bank" as opposed to "in PayPal"? It would seem that, at some point, PayPal's role vis a vis the individual customer would become so all-encompassing and PayPal's level of control over handling the funds would become so great, that PayPal should be regarded as the true depository for the purposes of banking law.

stage, the issue of whether PayPal has engaged in an actionable violation of plaintiff's rights under applicable law cannot be resolved at the pleading stage.

## IV.   RESPONSE TO PAYPAL'S SPECIFIC ARGUMENTS

PayPal presents argument related to four specific issues: EFTA (PayPal memorandum page 4); conversion (PayPal memorandum page 6); negligence (PayPal memorandum page 7); and unjust enrichment (PayPal memorandum page 8).  Plaintiff will address all four issues, but not in the same order as PayPal.

### NEGLIGENCE

The PayPal account used to perpetrate the unauthorized transfers was opened by an identity thief.  Mr. Dorsey never opened an account with PayPal and Mr. Dorsey never entered into an agreement with PayPal.  PayPal reasons that, because Mr. Dorsey did not enter into a contractual relationship with PayPal, PayPal assumed no duty to Mr. Dorsey and PayPal cannot be liable to Mr. Dorsey under a negligence theory.  Plaintiff would respond that PayPal fails to fully analyze the issues and PayPal misinterprets the relevant jurisprudence.

Courts have consistently held that banks and other financial institutions have a duty of due care to protect their customers, and this duty includes a duty to exercise due care to prevent unauthorized transfers from the customer's account.  Furthermore, this duty is separate from and in addition to the duties assumed by the bank under its contract with the customer.  Thus, when a customer sues a bank or financial institution for negligently allowing an unauthorized transfer, the customer will usually be held to have stated a claim.  *Shames-Yeakel v. Citizens Financial Bank*, 677 F.Supp.2nd 994 (N.D. Ill. 2009) (identity theft results in unauthorized withdrawal from customer's bank account, bank may be held liable under federal statutes and/or state law negligence theory); *Dubai Islamic Bank v. Citibank, N.A.*, 126 F.Supp.2d 659 (S.D. N.Y. 2000) (funds removed from

customer account via unauthorized transfers; customer sues bank, held: customer has stated claims for negligence and breach of contract).

Courts have also established the general principle that banks do not ordinarily have a duty to non-customers. Although certain exceptions apply, it may fairly be stated that in the majority of cases, a non-customer who attempts to assert a negligence claim against a bank will not be successful. However, only a few courts have addressed the specific issue presented here: when an identity thief uses the personal identifying information of a victim to establish an account in the victim's name, then who is the "customer" for the purposes of negligence law—the identity thief or the victim in whose name the account was opened? And if the victim is not the "customer", does the financial institution have any duty to the victim?

Analyzing the immediate issues in light of the above principles and the jurisprudence, it is apparent that the issue of negligence actually breaks down into three sub-issues, as follows:

*(i) Does a financial institution such as PayPal have a duty to exercise reasonable care to confirm the identity of a person who comes in to open a new account, and can a victim whose identity is stolen sue for breach of this duty*?

For courts in the U.S. Fifth Circuit, it appears clear that the answer to this question is yes, a duty exists, because the Fifth Circuit's decision in *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219, 225-232 (5th Cir. 2010) is close enough in point to be highly persuasive, if not controlling. In *Chaney*, the U.S. Fifth Circuit concluded that a victim whose identifying information is used to open an unauthorized account with a brokerage firm can sue the brokerage firm for negligence in failing to verify the account information at the time the account is opened. The Fifth Circuit reached this conclusion by applying New York State law. However, although the Fifth Circuit was nominally applying New York law, the Fifth Circuit began its analysis by recognizing that the issue was *res nova* in New York and would have to be resolved using general principles of negligence law which

are common to all jurisdictions. Thus, it may properly be inferred that if the Fifth Circuit were confronted with an identical fact pattern governed by the state law of Louisiana or Missouri, the Fifth Circuit—again using general negligence principles—would reach the same conclusion as in *Chaney*.[12]

Because the *Chaney* decision is controlling or close to it, further examination of this decision is warranted. *Chaney* involved a complex fact pattern. What happened, in pertinent part, was that an unauthorized person used the identifying information of five insurance companies to open five brokerage sub-accounts at Dreyfus Service Corporation (DSC). Then the thief used these accounts to drain the insurance companies' bank accounts and move the money outside the United States. The insurance companies' receiver contended that DSC was negligent in permitting the thief to open the accounts without double checking to confirm that the accounts were authorized. DSC responded, as PayPal does here, that DSC had no duty to the insurance companies because the insurance companies were not customers of DSC. The Fifth Circuit, applying New York state law, analyzed the issues as follows (*Chaney, supra*):

(Five accounts) were opened using the initials, taxpayer identification numbers, and addresses of the insurance companies. . . To say that DSC's efforts to identify the origin, legitimacy, or ultimate destination of the funds passing through its accounts were minimal is an understatement, such efforts were non-existent . . . This conduct was consistent with DSC's position . . . that its investment amounts are designed to provide maximum flexibility . . . and that DSC owes few if any

---

[12] Indeed, *Chaney* actually involved a choice of law issue: New York versus Mississippi. The Fifth Circuit resolved the choice of law problem by reasoning that a Mississippi court would probably reach the same conclusions as a New York court and, more specifically, a Mississippi court would probably conclude that an identity theft victim could bring a negligence claim against a financial institution that failed to exercise reasonable care to screen new account holders. Lacking controlling authority from Louisiana or Missouri, it is highly probable that the Fifth Circuit would follow exactly the same path in our case.

duties of care with respect to the processing of deposited funds. . . (*Chaney, supra,* 595 F.3d at 227-228).

> **[W]e first consider whether the insurance companies were "customers" for the purpose of any of the accounts . . . We recognize that DSCs relationship with the insurance companies was not that of a typical bank and its customers; in a very real sense, they were strangers to DSC.** This fact complicates any attempt to impose on DSC duties the New York courts have utilized to protect banks' traditional customers with whom there is a clear relationship . . . We thus consider as a matter of first impression whether New York courts would include such entities as customers.
>
> Under New York law, the imposition of a duty is a question of public policy. The court determines the parties to whom the duty runs "by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." . . .Although not explicit, it is clearly the fear of imposing on banks endless, unpredictable liability that drives New York's distinction between a bank's customers and non-customers. . .
>
> There is no such risk here. The funds in the accounts were registered to the insurance companies. The addresses and taxpayer identification numbers utilized in opening the accounts (*and DSC was aware that the insurers had an interest in the funds).* In short, the insurance companies in this case were well enough known to DSC that imposing the limited duties of care flowing to customers would hardly be crippling, nor would it "unreasonably expand" banks' "orbit of duty." **We accordingly disagree with DSC that the only way an entity can qualify as a "customer" and thus access the protections afforded to that status under New York tort law, is if it opens the account itself or has some equivalently direct personal relationship with the financial institution.** *(emphasis added)* (*Chaney,* 595 F.3d at 230-232).

Having reached this conclusion, the Fifth Circuit reversed the trial court's decision granting summary judgment on this issue and remanded the case so that the insurance companies could pursue their negligence claim against DSC.

The Alabama Supreme Court reached a similar result in *Patrick v. Union State Bank,* 681 So.2d 1364 (Ala. 1996). In this case, an identity thief opened a checking account in plaintiff's name using plaintiff's identifying information, then wrote numerous hot checks on the account, which resulted in plaintiff being arrested on hot check charges. The plaintiff sued the bank on a negligence

theory, the defendant responded that there was no duty, and the Alabama Supreme Court concluded

that the identity theft victim could pursue a claim against the bank for negligence (*Patrick, supra*):

> "The existence of a duty to the plaintiff is fundamental to a negligence claim." The bank's position is that in opening new accounts it has no legal duty to use due care to protect members of the general public from fraud perpetrated by a third party who might open a checking account as an imposter. . .

> [T]the question whether the bank owed Ms. Patrick a duty to exercise due care in opening checking accounts should be analyzed according to traditional principles. Whether a legal duty exists is a question of law. . . . This Court has relied upon the following principles relating to the question of duty:

> "In general, 'every person owes every other person a duty imposed by law to be careful not to hurt him.' In determining whether a duty exists in a given situation, however, courts should consider a number of factors, including public policy, social considerations, and foresee ability. . .

The Alabama Supreme Court carefully weighed the factors pointing toward and against permitting

the identity theft victim to pursue a negligence claim against the bank and concluded as follows:

> [W]e hold that a bank owes a duty of reasonable care to the person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter.

In sum, under the general principles of state tort law, when a new account is opened, a bank or

financial institution has a duty to exercise reasonable care to confirm that the account has been

opened by an authorized person and not by a thief.[13] Under this principle, Mr. Dorsey may properly

advance a negligence claim against PayPal.[14]

---

[13] In addition, as already pointed out above, in the post-9-11 time period, federal statutes and regulations have required banks to confirm the identities of new customers and most banks have chosen to do more than the law requires. Thus, if PayPal is a bank, the duty is clear and PayPal appears to have violated the duty. Even if PayPal is not classified as a bank, the jurisprudence still points strongly to the conclusion that PayPal had a duty to exercise reasonable care to confirm the identity of the person who opened an account using Mr. Dorsey's identifying information. Federal regulations which govern banks, as well as bank custom and practice, provide some guidance as to the actions which PayPal could reasonably be expected to take.

[14] In the interest of completeness, plaintiff would note that, in a subsequent decision which did not involve identity theft, the Alabama Supreme Court limited, but did not overrule, the holding of *Patrick*. *Smith v. AmSouth Bank, Inc*., 892 So.2d 905 (2004).

*(ii) Does a financial institution such as PayPal have a duty to monitor existing customer accounts in an effort to determine whether the customer is using the account to perpetrate a fraudulent scheme?*

The generally accepted rule is that banks do NOT have an ongoing duty to monitor customer accounts for the purpose of noting signs of fraud by customers. However, the cases which establish this generally accepted rule are cases in which the plaintiff was neither a bank customer NOR the victim whose identity was used to open the fake bank account.[15] And even in this situation, there is some difference of opinion as to the nature and extent of the bank's duty.[16] Thus, these cases, on their face, do not dispose of the situation in which the plaintiff is the person whose identity was used to open the account.

Another point to note is that the cases which establish the "no duty" rule all involve *banks.* Banks are heavily regulated institutions which are required to take many steps to protect the public, including, for example, the duty to confirm identity of a new account holder. PayPal has argued energetically in the past that *PayPal is not a bank.* PayPal will no doubt argue to this Honorable Court in this current litigation that *PayPal is not a bank.* Furthermore, as the description of PayPal's business model set forth above will show, PayPal operates an internet financial system with little or no supervision by federal and state regulators. PayPal's system presents opportunities for fraud which are considerably greater than the opportunities available to those who use traditional banks to process their financial transactions.

If PayPal is not a *bank,* and if PayPal's operations involve risks which are different from, and in some respects greater than, the risks posed when financial transactions are carried out by traditional *banks*, then why, exactly, should PayPal be permitted to shelter behind jurisprudence

---

[15] *See, e.g., Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220 (4th Cir. 2002) (identity thief posing as Bear Stearns representative opens account in name of Bear Stearns, uses account to deceive plaintiff into believing that plaintiff's funds are being transmitted to Bear Stearns; held: plaintiff has no cause of action against bank for negligence.)

which is intended to shield *banks* from liability that the courts view as unwarranted or excessive? This is a question which does not have an obvious answer. On the present state of the record, it is not clear what, exactly, PayPal does or how PayPal should be classified for legal purposes. Furthermore, it is not entirely clear how the identity thief was able to raid Mr. Dorsey's account. Plaintiff would submit that, in a situation in which this Honorable Court does not know what happened or what role PayPal played (or failed to play) in the events which occurred, it would be premature to say that PayPal had no duty. This is a question which should properly be addressed at the summary judgment stage or at trial after sufficient discovery has been conducted.

> *(iii) If an employee of a financial institution engages in actions which facilitate a customer's fraudulent scheme, can the financial institution be held liable for negligent supervision or vicariously?*

At this early point in the litigation, plaintiff has little reason to believe that PayPal or any PayPal employee engaged in an intentional wrongful act. However, given the current record, this possibility cannot be eliminated. Therefore, it is important to recognize that, when a bank employee's wrongful actions cause loss to a non-customer, the bank may be held liable for negligent supervision if the evidence warrants the conclusion that negligent supervision has taken place. *New York Islanders Hockey Club, LLP v. ComericaBank-Texas,* 71 F.Supp.2d 108 (E.D. New York 1999) ( held: plaintiff has a negligent supervision claim against bank).

### THE ELECTRONIC FUND TRANSFERS ACT (EFTA)

EFTA applies to banks and to a wide variety of other financial institutions. In addition, EFTA gives rights to "consumers" not just customers. PayPal tacitly concedes that it is a financial institution whose activities are governed by EFTA. However, PayPal argues that the term "consumer" as used in EFTA is equivalent to the term "customer" —meaning, in PayPal's view, that

---

[16] A representative case would be *Grad v. Associated Bank, N.A.*, 2010-AP 1461, (Wis.App. 6/7/11); 801 N.W.2d 349, which is unpublished but available on Westlaw. In this case, the majority holds that banks have no duty to monitor

EFTA gives rights only to people who enter into agreements with financial institutions, and since Mr. Dorsey didn't enter into an agreement with PayPal, he should not be regarded as a customer of PayPal for EFTA purposes and he cannot assert a claim under EFTA.

The issue of how EFTA should apply to an account opened through identity theft parallels the issue of how state law should apply to an account opened through identity theft. Plaintiff is aware of only one reported EFTA decision dealing with the status of an account opened by an identity thief, *Marquess v Penn State Employees Credit Union* 09-4256 (E.D. Pa. 8/31/2010); 2010 WL 3448086 *reversed* 10-3877 (3rd Cir. 5/12/11); 427 F.Appx. 188, wherein the trial and appellate courts reached diametrically opposite conclusions.[17] The trial court relied on the statutory language to conclude that, when an identity thief opens an account in the name of a victim using identifying information of a victim; and when the financial institution believes the victim to be its customer and acts as though the victim is its customer, then the victim, not the identity thief, is the "consumer" for EFTA purposes and the victim, not the identity thief, is the person whose rights are protected under EFTA. Rejecting an argument identical to the one presented by PayPal here, the trial court reasoned as follows:

> [T]he EFTA definition of a "consumer" is very broad, specifying only that a consumer must be "a natural person" 12 CFR 205.2(e). It does not specifically require the consumer to be a depositor or party to a contract with the bank. . .
>
> PSECU points out that in some places, EFTA seems to assume that the consumer has a relationship with the bank, such as where it states that the statute covers "any electronic funds transfer that authorizes a financial institution to debit or credit a consumer's account." 15 U.S.C. 1693(a)(2). An Official Staff Interpretation for §205.3 states: "The requirements of the regulation apply only to an account for which an agreement for EFT services to or from the account has been entered." 12 CFR Pt. 205, Supp. 1 §205.3 (emphasis supplied).

---

existing accounts for fraud, while an impassioned dissent argues for the opposite rule.
[17] The appellate decision was designated by the Third Circuit Court of Appeal as "not for publication" so it is not clear what weight this decision should be given. As a practical matter, the decision, even if published, would not be controlling in our case.

Undoubtedly, the ordinary unauthorized funds transfer case involves an individual with an account created through direct contact with the bank. However, PSECU is putting more weight on these quotations than they can bear. These quotations do not purport to define the term "consumer;" instead, they define the type of transaction covered by EFTA. In any event, the Official Staff Interpretation for §205.3 is cast in the passive tense. Jason did not enter an agreement for EFT services, but such an agreement *was entered* by William Marquess.

Moreover, as PSECU points out, "in the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress " . . . EFTA is a consumer protection statute, and I am reluctant to imply a meaning into regulatory language which would preclude an action by an injured individual. PSECU has not argued in this case that Jason Marquess committed any fraud with respect to this account. I conclude, therefore, that on the specific and unusual facts in this case, Jason Marquess should be considered a "consumer" entitled to EFTA protection.

The Court of Appeal in the same case reached precisely the opposite conclusion, reversed the trial court's judgment, and held that the victim of an identity thief does not become a "consumer" within the meaning of EFTA, reasoning as follows:

Under the Federal Reserve Board's official staff interpretation, the EFTA does not apply unless the consumer has entered an agreement for EFT services:
1. Accounts covered. The requirements of the regulation apply only to an account for which an agreement for EFT services to or from the account has been entered into between:

i. The consumer and the financial institution (including an account for which an access device has been issued to the consumer, for example);

ii. The consumer and a third party (for preauthorized debits or credits, for example), when the account-holding institution has received notice of the agreement and the fund transfers have begun.

12 C.F.R. Pt. 205, Supp. I §205.3. We credit this interpretation because it is not "demonstrably irrational." . . . Because no agreement existed between any plaintiff and PSECU, the EFTA does not apply. *See* 12 C.F.R. Pt. 205, Supp. I §205.3(1)(i).

Plaintiff would ask this Honorable Court to lay the *Marquess* trial court decision, the *Marquess* appellate decision, and the Fifth Circuit's *Chaney* decision side by side. Plaintiff would submit that the reasoning of the *Marquess* trial court is persuasive, the reasoning of the *Marquess* appellate court relies on an unduly restrictive interpretation of the statutory and regulatory language and, although

*Chaney* does not address the applicability of EFTA, the common sense and policy considerations that inform the *Chaney* decision are relevant to the EFTA analysis.

For these reasons, this Honorable Court should conclude, as a matter of first impression in this Circuit, that EFTA provides protection to a victim when an identity thief opens an account by using the victim's name and financial information.

**CONVERSION**

PayPal argues that PayPal can only be found responsible for conversion if PayPal is shown to have exercised dominion over Mr. Dorsey's funds. PayPal characterizes itself as a mere passive conduit by which other people transmit money through the internet, with PayPal having no active role. "PayPal never had possession of plaintiff's funds," says PayPal in boldface on page 6 of its memorandum.

Plaintiff would submit that PayPal's own description of its activities to regulators and the press, summarized above, is sufficient to defeat this claim, at least at the initial pleading stage. According to PayPal's own description of its activities, what PayPal actually does is transfer money out of the individual bank account identified by the PayPal customer as his or her personal account; deposit this money into an account in a different bank or money market fund; the depository bank or money market fund is selected by PayPal; the account in the depository bank or the money market fund is held in PayPal's name and a PayPal account holder who desires to access the deposited money can only access the funds through PayPal's website and only with PayPal's cooperation and consent; PayPal has the right to "freeze" an account if there is a dispute or if PayPal suspects fraud; and, finally, PayPal has charges fees for most of the transactions it processes and PayPal deducts the fees from the account according to the terms of PayPal's account agreements with individual account holders.

With regard to the fees charged by PayPal, plaintiff would point out that PayPal didn't merely "possess" or "control" the funds diverted from Mr. Dorsey's bank account into the PayPal account, PayPal actually kept a percentage of the money transferred as its fee for arranging the transfers. In other words, PayPal didn't simply control the funds temporarily—PayPal actually kept some of Mr. Dorsey's money for PayPal's own use and benefit.

In view of the above, there is absolutely no basis for concluding that PayPal's role in the conversion of Mr. Dorsey's funds was that of a mere passive conduit or that PayPal "never had possession" of Mr. Dorsey's funds. Indeed, there is no basis for concluding at this early stage of the litigation that PayPal is an innocent party.[18] There is no basis for dismissing plaintiff's conversion claim at this early stage of the litigation.

### UNJUST ENRICHMENT

PayPal's argument with respect to unjust enrichment is somewhat circular. In the first part of its memorandum, PayPal argues that plaintiff has no remedy for negligence, conversion, or under EFTA. However, PayPal begins its argument with respect to unjust enrichment by asserting that, because plaintiff has remedies other than an unjust enrichment claim, therefore plaintiff cannot pursue an unjust enrichment claim (PayPal memorandum pages 10-11):

> Unjust enrichment . . . is only applicable to fill a gap in the law where no express remedy is provided. . . Here, the fifth element of unjust enrichment cannot be met because there are other remedies available to plaintiff.

PayPal's reasoning, apparently, is that plaintiff has, in theory at least, a remedy against the identity thief and therefore plaintiff cannot seek a remedy against PayPal.

---

[18] Did a PayPal employee abuse his position to convert plaintiff's funds to his own benefit? Did this occur under circumstances in which PayPal supervisors knew or should have known that the PayPal employee was untrustworthy? Has upper level PayPal management tacitly concurred in the rifling of customer accounts to the point, even, of possibly giving rise to an unfair trade practices or RICO claim as well as a conversion claim? *See Farinella v. PayPal, Inc.*, 611 F.Supp.2d 250 (E.D. N.Y. 2009) (settlement of RICO, unfair trade practices, and breach of contract claims against PayPal).

Plaintiff would point out that the issue, for unjust enrichment purposes, is whether the plaintiff has an alternative remedy against the unjustly-enriched defendant, not whether plaintiff has an alternative remedy against a third party (especially when the alternative remedy is purely theoretical).

Additionally or in the alternative, PayPal argues that plaintiff has not alleged that PayPal has been unjustly enriched. Plaintiff would respond by pointing out that the record does NOT support this conclusion. To begin with, for all plaintiff knows, PayPal is the identity thief. Plaintiff regards this possibility as unlikely, it is certainly not impossible.

Furthermore, even if PayPal is not the identity thief, PayPal has been "enriched" by the identity thief's actions inasmuch as PayPal charges fees to account holders, as specifically alleged in the complaint. PayPal characterizes its own role in transferring money as agent of the PayPal account holder. PayPal denies that Mr. Dorsey was the PayPal account holder, even though his identity was used to establish the account, so it would appear to follow that PayPal acted as agent for the identity thief. More specifically, it appears that PayPal, acting as agent for the identity thief, removed approximately $ 1.9 million dollars from Mr. Dorsey's personal bank account and placed this money in a different account held in the name of PayPal as agent. PayPal then proceeded to disburse the money from this account by dividing the money with the identity thief such that PayPal received between $5,000 and $40,000 of Mr. Dorsey's money (plaintiff's rough estimate) as compensation for its services to the thief, and the thief received the balance.

In sum, instead of attempting to check the identity thief's credentials, instead of attempting to prevent the identity thief from defrauding plaintiff, PayPal has apparently earned a handsome fee for assisting the identity thief in his illegal scheme. PayPal employees probably did not realize at the time that the scheme was illegal, but PayPal is now aware of the illegality—and PayPal evidently

21

wishes to retain the money which is currently in PayPal's possession as the result of the illegal scheme. Plaintiff would submit that, if plaintiff has no other remedy against PayPal for this behavior, then the doctrine of unjust enrichment should apply.

## CONCLUSION

For all the above and foregoing reasons, PayPal's motion to dismiss (Rec. Doc. No. 24) should be denied.

Respectfully submitted,

s/ J. E. Cullens, Jr.
J. E. Cullens, Jr., T.A., La. Bar #23011
WALTERS, PAPILLION, THOMAS, CULLENS, LLC
12345 Perkins Road, Bldg One
Baton Rouge, LA 70810
Phone: (225) 236-3636
Facsimile: (225) 236-3650
Email: cullens@lawbr.net

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served, via electronic mail via the Court's CM/ECF system, to the following:

John M. Duck
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139

V. Thomas Clark, Jr./Melissa M. Grand
450 Laurel Street, Suite 1900
Baton Rouge, Louisiana 70801

S. Gene Fendler/Shannon S. Holtzman
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099

on this 21st day of November, 2011.

s/J. E. Cullens, Jr.

J.E. Cullens, Jr.